**Bryan MELTON, and wife, Mrs. Bryan Melton, on behalf of their minor son, Rod Melton**

v.

**Corley R. YOUNG et al.**

**Civ. A. No. 6018.**

United States District Court,
E. D. Tennessee, S. D.

June 19, 1971.

Jack Kershaw, Nashville, Tenn., for plaintiffs.

Raymond B. Witt, Jr., Chattanooga, Tenn., for defendants.

## OPINION

FRANK W. WILSON, Chief Judge.

This lawsuit, involving the suspension of a high school student from a public school, presents two issues of federal constitutional dimension. One issue is whether a public school regulation forbidding students from wearing "provocative symbols" upon their clothing is violative of the First and Fourteenth Amendments. The second issue presented is whether the suspension of a student for refusal to cease wearing a "shoulder patch consisting of a replica of the Confederate flag was violative of the First and Fourteenth Amendments under the circumstances shown to have been existing within the school at the time of the suspension.

At an initial hearing upon a motion for preliminary injunction held shortly after the suspension of the student, an understanding was reached whereby the student agreed to return to school without further wearing the Confederate emblem pending a final decision of this lawsuit and the school authorities, who are the defendants herein, agreed that the return of the student to school under such circumstances would be permitted and would not constitute a waiver of any issues sought to be raised by the plaintiff in the lawsuit, nor would it render moot any such issue. A preliminary order was entered pursuant to this agreement of the parties.

It may appropriately be noted that although in the initial stages of this lawsuit the plaintiffs made certain contentions regarding denial of procedural due process and denial of equal protection of the law in connection with their son's suspension, at a pretrial conference the plaintiffs' counsel advised that in the interest of assuring a decision upon the merits of the plaintiffs' freedom of speech contentions made pursuant to the First and Fourteenth Amendments, the plaintiffs did not intend to pursue further their contentions regarding lack of procedural due process or denial of equal protection of the laws in the manner in which the suspension was accomplished. Furthermore, it appears to the Court from the evidence that the procedure by which the suspension was accomplished was fundamentally fair and regular and that there were no violations of either procedural due process or equal protection of the laws in connection therewith. As will be noted more fully hereinafter, the student was at all times fully advised as to the nature of the infraction with which he was charged and was afforded opportunities both for correction of the infraction and for hearings in connection with his suspension. The evidence is found insufficient to establish arbitrary action or discrimination in the suspension procedure followed.

The evidence in this case is voluminous and encompasses many matters that are of only peripheral relevance. Although the parties filed extensive stipulations of fact, an additional five days was taken up in testimony. A substantial portion of the testimony now appears to have been repetitious of matters set forth in the stipulations.

The relevant facts appear to be largely undisputed and they are as follows: Brainerd High School is one of five public high schools operated by the School Board for the City of Chattanooga, Tennessee. At the time that a dual school system was being operated by the City for black and white students, Brainerd High School was operated as an all white school. During the period it was being so operated the student body had adopted the name "Rebel" as the school nickname and the practice had developed of using the Confederate flag as the school flag and the song "Dixie" as the school pep song. As a result of this Court's order, the school was desegregated in 1966 and since that time the student body has been composed of both races. At the commencement of the school year 1969 the racial composition of the student body consisted of 1,224 white students and 170 black students. During the initial years of desegregation there appears to have been no significant events within the student

body tending to polarize the students along racial lines. Commencing with the opening of school in the fall of 1969, however, a series of events occurred which ultimately led not only to serious disruption within the school, resulting in the closing of the school upon two occasions in the spring of 1970, but also the disruption spread throughout the City of Chattanooga and resulted in a city-wide curfew being imposed in an effort to abate racial tensions and to restore order.

Whatever may have been the underlying causes and reasons for disharmony developing within the school, it is clear that by the fall of 1969 the use of the Confederate flag as a school symbol, as well as the use of the song "Dixie" as the school pep song, had become an issue with a number of the black students. The first overt sign of this was a walkout by a number of black students at a school pep rally on September 9, 1969, in protest of the use of the Confederate flag and song. At a similar student pep rally on September 12, 1969, a larger group of black students walked out in protest of the symbol and song. On October 3, 1969, all black students walked out of a student pep rally, again in protest of the continued use of the flag and song. Up to this point the walkouts had been accomplished peacefully. At a school football game on the evening of October 3, 1969, however, serious trouble appears to have been narrowly averted when a group of black students left their seats in unison at the half time of the game and went upon the playing field where one or more of the students attempted to burn a Confederate flag. Police action was required on this occasion to restore order.

Polarization along racial lines now began to appear within the student body and altercations began to occur within the school with increasing frequency between black and white students. By this time students of both races appear to have been receiving outside encouragement for their respective positions regarding the school flag and song. The

controversy over the flag and song were now spreading to the community.

, On October 8, 1969, classes were disrupted for a period by a walkout of some 400 white students, soon followed by another 600 white students, in protest over reports that the Confederate flag and the song "Dixie" were to be dropped as the school symbol and pep song. Shortly before this time, a student biracial committee had been established within the school and had suggested that the controversy over the school flag and song be resolved by a student vote. After some equivocation, this suggestion was rejected by school authorities.

On the evening of October 8, a sizeable motorcade drove through various parts of the City waving Confederate flags and otherwise expressing their partisanship. Also on this evening some 500 parents attended the School Board meeting to express their concern over the growing dissension at Brainerd High School and the apparent lack of effective disciplinary action.

During the night of October 11, 1969, a tense racial situation developed within the City when some 500 to 600 students and adults gathered in the Brainerd commercial area waving Confederate flags, singing "Dixie" and otherwise demonstrating their partisanship. In the meanwhile, a number of Negroes gathered nearby, likewise demonstrating their partisanship. Rocks and bottles were hurled at passing vehicles waving Confederate flags. A confrontation was avoided only after a number of arrests were made and after appeals were made by public officials to the crowds to disperse. In an effort to lessen the rising tensions within the City and to head off further racial confrontations, a city-wide curfew was imposed for four nights, from October 13 through October 17, 1969.

Throughout the remainder of the fall semester, considerable racial tension existed within the student body. Nighttime athletic events were rescheduled to be held in the afternoon. Sporadic fight-

ing occurred between students of different races and some students were suspended from school. In January of 1970 a new principal, Dr. B. L. Von Schaaf, was assigned to the school and a number of steps were taken to tighten discipline within the school.

During the spring of 1970 racial incidents continued to occur at the school and racial tensions continued to mount. On April 14, 1970, a major confrontation between black students and white students developed in the school cafeteria. Although this was broken up by school authorities without a fight having developed, the black students then refused to return to their classes for a time. When school was let out that afternoon, another major confrontation developed between the black and white students in the schoolyard, requiring the calling of some 40 policemen to restore order. Nine students were arrested upon this occasion.

The following day, April 15, racial tensions and racial incidents continued to mount. Black students gathered in the hallways and refused to go to classes. They stated that they were dissatisfied with school social clubs and extracurricular activities and would not be a part of the school so long as it maintained its present school symbols. Two fires of undetermined origin were discovered and put out in the school auditorium. It was again necessary to call a large number of police to maintain order and several altercations between students and police occurred. In an effort to restore order and to lessen tensions, it was announced that the school would be closed for the next two days, April 16 and 17. However, when classes were resumed the following week, racial turmoil promptly broke out again, resulting in student confrontations in the hallway, students refusing to go to class, fights, rock throwing, and other destructive actions being committed. Again a large number of police were called onto the campus, this time supported by city firemen. By April 22, 1970, it became necessary once again to close the school,

this time not to be reopened until April 28, 1970. In the meanwhile, extensive plans were made for further tightening school discipline, reassuring the faculty, who by this time had become concerned for their own safety, and otherwise planning for the reopening of the school.

Up to this time only a rather limited number of students had been suspended from school for participation in the disorders, the reason given being that in most instances group action was involved and individual responsibility could not be placed. However, for the remainder of the term a substantial number of suspensions were made for infraction of school rules. In addition, many regular school activities were curtailed, particularly those scheduled to occur in the evening or off of school premises.

In the latter part of May 1970, a committee of nine prominent citizens was appointed by joint action of the school administration and the Brainerd High School P.T.A. This committee was assigned the task of reviewing the problems besetting the School throughout the past year and recommending corrective action for the following year. After extensive investigations the committee filed a report identifying seven factors as having been most significant in contributing to the tensions and disorder in the School during the past year. One such factor so identified was the symbolism being used by the School, or, more specifically, the nickname "Rebel," the Confederate flag, and the song "Dixie." Regarding these the committee stated: "The focal point of the single factor most discussed was the problem of symbols, that is, (a) the name 'Rebel,' (b) the song 'Dixie,' and (c) the Confederate flag." Regarding school symbols, the committee recommended that the name "Rebel" be retained, but that use of the Confederate flag as a school symbol and use of the song "Dixie" as a school pep song be discontinued.

This portion of the committee's report along with other portions, were approved and adopted as school policy

by the School Board at its meeting upon July 8, 1970. The School Board further directed at that time that prior to the opening of school in September 1970 the principal in each school within the system develop a code of student conduct and make distribution of the same at the opening of school. In response to this directive, Dr. Von Schaaf and his staff revised and implemented a code for student conduct that initially had been developed in the spring of 1970. Among other rules contained in this code was the following: "Also, provocative symbols on clothing will not be allowed."

At the opening of school in the latter part of August 1970, orientation sessions were held at Brainerd High School, both with students and with their parents, and the above named rules, along with other information, were distributed and discussed. At the same time students and parents were advised as follows: "Accoording to the Board of Education July 8, 1970 meeting, the status of symbols for Brainerd High School is as follows: 'The Confederate flag and Confederate soldier cannot be used as symbols for any public school in Chattanooga; therefore, all displays of the flag and soldier are removed from the school premises and cannot be used in any display where Brainerd is involved.'" The plaintiff, Rod Melton, as well as his parents, who are also plaintiffs, were advised of these matters at that time and received copies of the rules and of the other information referred to.

So much by way of background. Turning to the immediate facts giving rise to this lawsuit, the following relevant matters appear largely, if not wholly, undisputed in the record: The plaintiff, Rod Melton, first entered Brainerd High School during the year 1969. He was in the junior class during the school year 1969–70, and attended school throughout that year. He was present as a witness to many of the events indicated above and was himself involved upon one or more occasions, at least to the extent of separating the combatants. He also received a short disciplinary suspension

from school during the year for wearing an outer garment with a cross and the letters "KKK" upon it.

On September 8, 1970, the plaintiff, Rod Melton, wore a jacket to school having an emblem depicting the Confederate flag sewn on one sleeve. During the course of the morning the matter was reported to Dr. Von Schaaf by a faculty member and the plaintiff was sent to the principal's office. He was there requested by the principal to remove the emblem or cease wearing the jacket while attending school, but he declined to do so. He was allowed to return to his class, but further complaints were received from both the faculty and students, including some six or ten black students, regarding his being allowed to wear the Confederate emblem in school. The principal thereupon again called the plaintiff to his office and requested that he remove the jacket, but the plaintiff again declined to do so. Stating that the emblem was provocative in his judgment and that it was a violation of the school code, Dr. Von Schaaf directed that the plaintiff either remove the jacket or leave the campus. He elected to leave campus.

The following day, September 9, 1970, the plaintiff, Rod Melton, again appeared at Brainerd High School wearing the same jacket with the Confederate symbol sewn on the sleeve. Once again he was sent to the principal's office and instructed to remove the jacket or the emblem. Again he declined to do so, representing that his purpose in wearing the Confederate symbol on his jacket was merely to demonstrate his pride in his Confederate heritage and not for any other purpose. He was thereupon instructed to leave school and not return until he was willing to cease displaying the Confederate emblem on his clothing while in school. On the occasion of his suspension both upon September 8, 1970, and upon September 9, 1970, letters were sent by the principal to Rod Melton's parents advising them of the action taken and the reasons therefor. Further conferences were held between the princi-

pal and Mrs. Melton, but no resolution of the matter was reached. Thereupon this lawsuit was filed.

The foregoing is an abbreviated statement of the voluminous evidence placed in the record in this case. However, it is believed to adequately state the facts essential to the decision of the case. Each of the parties introduced considerable other evidence which at most was only of limited relevance. Among such evidence introduced by the plaintiffs was the following: (a) that the Confederate flag, rather than standing for slavery and the degredation of the black race, is an honored emblem standing for bravery and other patriotic virtues; (b) that little or no effort was made by school authorities to educate black students to the true meaning of the Confederate flag; (c) that black students were incited by black militants to protest the Brainerd High School symbols in the fall of 1969; (d) that the failure of school authorities to use firm discipline, particularly in the early stages of black student protests, was a contributing factor to matters getting out of hand at later stages in the year; and (e) that other symbols of a provocative nature, such as the black fist, the Afro hair style, and the peace symbol, were permitted to be worn or displayed by students on the school premises. On the other hand, the defendants, in addition to going into extensive detail regarding each of the events recounted above, sought to introduce evidence that the plaintiff, Rod Melton, had engaged in activities on other occasions, both prior to and subsequent to his suspension, reflecting a strong partisanship in racial matters. The plaintiffs introduced rebutting proof on these matters and sought to show that young Melton was a well behaved and honor student.

■■■  As stated, the Court is of the opinion that each of the foregoing matters is only of limited relevance. There would appear to be no genuine relevance between the plaintiff's racial attitudes as expressed on other occasions and whether his right to free expression was curtailed on September 8 and 9, 1970, to an extent not permitted by the Federal Constitution. The plaintiffs' contentions regarding black aggression in placing the school symbols in controversy and regarding the alleged failure of the School to educate black students in regard to the school symbols or to discipline them in their protests against the symbols do not alter the fact that school officials had every right to anticipate that a tense racial situation continued to exist as of the opening of school in September of 1970. Nor do these contentions of the plaintiffs alter the fact that much of the controversy the previous year had centered around the use of the Confederate flag as a school symbol. To the extent that the plaintiffs may contend that prior errors in school administration limited the principal in taking corrective action in September of 1970, the contention is clearly without merit. The principal was confronted with the assignment of operating the school under the facts as they existed in September of 1970, regardless of how those facts might have been changed had no prior errors been committed. When applied on a larger scale, such reasoning would lead to the assertion that had no errors been committed prior to 1860, no Civil War would have occurred, with the consequence that no Confederate flag would have come into existence. "Dixie" would have remained a minstrel song, and the word "rebel" would have remained a generic word.

■■  Before turning to the two specific constitutional issues presented in this case, certain general propositions of law should be noted. First and foremost of these is the specific relevant language of the First Amendment wherein it is provided: "Congress shall make no law * * * abridging the freedom of speech * * *" Although the language of the First Amendment is a limitation upon the power of Congress, the principle is now firmly established that the concept of due process as contained in the Fourteenth Amendment incorporates all of the fundamental rights contained within the First Amendment, including freedom of speech, and accordingly forbids any state abridgement thereof. Tinker v. Des Moines, 393 U.S. 503, 89 S.Ct. 733,

21 L.Ed.2d 731 (1969); Talley v. Calif., 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). Whenever any public body acts so as to injure the person or property or restrict the freedom of an individual, the Constitution requires that such action be consonant with due process of law. As noted, the First Amendment does not speak equivocally, but rather is broad and explicit in its scope. Regulatory measures, no matter how well intentioned or how sophisticated, cannot be employed by public bodies if their purpose or effect is to stifle, penalize, or curb the exercise of rights guaranteed by the First Amendment.

■■ Upon the other hand, it should likewise be noted that the right of free speech is one of many rights guaranteed by the Constitution and accordingly must be interpreted in harmony with and so as not to infringe upon other rights equally secured by the Constitution. That is, freedom of speech is not an absolute right. Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131, reh. den. 337 U.S. 934, 69 S.Ct. 1490, 93 L.Ed. 1740 (1948). The exercise of free expression must on occasion be subject to some limitations, otherwise such institutions as churches, schools, and other places of public assembly, not to mention the courtrooms themselves, would become Towers of Babel. Under the Constitution Society has an interest in free expression. Under the same Constitution Society also has many other interests, including the operation of schools. Wholly apart from any incitation, no thoughtful person would suggest that a student should be permitted to stand and sing "Dixie" in a classroom as the mood might strike him, nor even to recite the Oath of Allegiance in so unregulated a manner. Reasonable and non-discriminatory regulations of time, place, and manner are always permissible restrictions upon expression. Expression can never be limited, however, merely because of disagreement with or dislike for its content.

■ Finally, it should be noted that "symbolic speech," although not always readily distinguishable from conduct and accordingly somewhat ill-defined in the law, is accorded First Amendment protection the same as "pure speech." See Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), wherein the Court held that wearing of arm bands "is closely akin to 'pure speech.'" See also Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Hodsdon v. Buckson, 310 F.Supp. 528 (D.C.Del.1970).

Turning to the specific constitutional issues presented for decision in this case, the Court must first decide whether a public school regulation forbidding students from wearing "provocative symbols" upon their clothing under penalty of possible suspension from school is violative of the First and Fourteenth Amendments. The specific regulation here involved provides: "Also, provocative symbols on clothing will not be allowed." Although elsewhere in the regulations Confederate symbols were barred from use as school symbols and although there is evidence that the words "provocative symbols" were construed by the school principal to mean "that which would cause a substantial disruption of the student body," such as interpretation is subjective to the principal, for nowhere in the regulatory scheme are the words "provocative symbols" defined.

■ Vague laws or regulations in any area are likely to suffer a constitutional infirmity. The likelihood of constitutional infirmity is greatly enhanced where First Amendment rights may be affected by the laws or regulations. As stated by the Court in the case of Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966): "Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech . . . [may] suffer."

■ Accordingly, precision and specificity are essential to the validity of

a public law or regulation affecting freedom of speech if the law or regulation is to pass constitutional muster under the First and Fourteenth Amendments. In this regard, see Keyishian v. Board of Regents of University of State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L. Ed.2d 629 (1967), wherein the Court stated:

> "We emphasize once again that 'precision of regulation must be the touchstone in an area so closely touching our most precious freedoms, * * * for standards of permissible statutory vagueness are strict in the area of free expression * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' "

The word "provocative" is defined by Webster to mean "serving or tending to provoke, excite, stimulate, or incense * * * especially to stir up controversy or discussion." Accordingly, under any such definition, the words "provocative symbols" may encompass an almost limitless number and variety of symbols. The barring of "provocative symbols" under penalty of possible suspension from a public school is clearly too vague, broad, and imprecise a regulation to be allowed to stand before the requirements of either the First or the Fourteenth Amendments. As emphasized in the case of Tinker v. Des Moines Independent Community School District, *supra*, limitations on the use of symbols or other activity closely akin to "pure speech" are permissible only in carefully restricted circumstances. The prohibition of all "provocative symbols" is clearly beyond these restrictive bounds. See also Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1930).

The striking of the "provocative symbols" regulation from the Brainerd High School student code does not resolve all issues in this lawsuit. Although the principal cited the regulation in support of his action in ordering the

plaintiff to remove the Confederate flag shoulder emblem while attending school on September 8 and 9, 1970, the validity of the principal's action in ordering the removal of the emblem or in suspending the plaintiff upon his refusal to do so is not dependent upon the validity of the regulation. A public school principal is charged under Tennessee law with the responsibility for the operation of the school to which he is assigned. His authority in this regard is commensurate with his charge. See T.C.A. § 49–1309; Phillips v. Johns, 12 Tenn.App. 354 (1930). A public school principal is responsible for maintaining such discipline and order within the school as will permit the educational processes to be carried out. His plenary authority in this regard is not dependent upon the adoption of a written code of student conduct in each school, although the latter may be the desirable practice.

Accordingly, there remains for decision the issue of whether the suspension of a student for refusal to cease wearing a shoulder patch consisting of a replica of the Confederate flag was violative of the First and Fourteenth Amendments under the circumstances shown to have been existing within Brainerd High School at the time of the suspension.

As previously noted, the right of free expression is not absolute or without limits. For one thing, reasonable and non-discriminatory regulation of time, place, and manner are permissible. Another limitation, historically speaking, is that permitted by the clear and present danger rule. The usual statement of law in this regard is that a limitation of free speech may be permissible if it is justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. In this regard see Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L. Ed. 470 (1918), wherein Justice Holmes made his classic observation that "The most stringent protection of free speech would not protect a man in falsely shouting *fire* in a theatre and causing a panic."

More specific to the problem here presented, however, are the principles and guidelines laid down in the recent case of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The facts there presented were that students were suspended from a public school when they refused to remove black armbands worn in protest against the war in Viet Nam, the wearing of such armbands being a violation of a school regulation directed specifically thereto. The Court held that the First Amendment right of freedom of speech was available to teachers and students within the schoolhouse as well as without and that the wearing of black armbands by the students as a symbolic act, entirely divorced from actually or potentially disruptive conduct, was closely akin to "pure speech" and therefore entitled to comprehensive protection under the First Amendment. The Court concluded that, upon the record presented, the action of the school authorities appeared to have been based upon the desire to avoid controversy in that there was no evidence that the school authorities had any reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students or that the prohibition was necessary to avoid material and substantial interference with school functions. Holding that a student may express controversial opinions so long as he does so without materially and substantially interfering with appropriate discipline in the operation of the school and without abridging the rights of others, the Court struck down the armband regulation as violative of the First Amendment.

Relying significantly upon two Fifth Circuit cases decided in 1966 (Burnside v. Byars, 363 F.2d 744, and Blackwell v. Issaquena County Board of Education, 363 F.2d 749) in one of which a school regulation banning the wearing by students of civil rights freedom buttons was stricken down and in the other of which the same regulation was sustained because of differing circumstances prevailing in the two schools, the Supreme Court used the following language that is of particular relevance to the facts of the principal case:

"A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfering with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others. Burnside v. Byars, supra, 363 F.2d at 749. But conduct by the student, in class or out of it, which for any reason —whether it stems from time, place, or type of behavior—materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. Cf. Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966)."

Unlike the Tinker case, where the Court found no evidence of either actual or potential disruptive conduct, but only an "undifferentiated fear or apprehension of disturbances," the record in the present case reflects quite clearly that there was substantial disorder at Brainerd High School throughout the 1969–70 school year, that this disorder most materially disrupted the functioning of the school, so much so that the school was in fact closed upon two occasions, that much of the controversy the previous year had centered around the use of the Confederate flag as a school symbol, and that the school officials had every right to anticipate that a tense racial situation continued to exist as of the opening of school in September of 1970. Under these circumstances Brainerd High School officials were not required to wait until another disruption occurred before restricting the use of the symbol previously found to have caused the dis-

ruption or to have contributed to the causing of the disruption.

In the recent case of Guzick v. Drebus, 431 F.2d 594 (1970), a case decided since the *Tinker* decision, the Court of Appeals of this Circuit, after discussing the *Tinker* case, upheld a public school no-symbol rule. In so doing, the Court stated, among other matters, the following:

> "In our view, the potentiality and the imminence of the admitted rebellious-ness in the Shaw students support the wisdom of the no-symbol rule. Surely those charged with providing a place and atmosphere for educating young Americans should not have to fashion their disciplinary rules only after good order has been at least once demolished."

The suspension of the plaintiff by the principal of Brainerd High School for refusing to cease wearing, while at school, a Confederate flag as a shoulder patch, was not based merely upon the principal's disagreement with nor dis-like for the symbol. On the contrary, the principal stated he had no personal objection to the symbol. Nor was it prompted by a mere desire on the prin-cipal's part to avoid the discomfort and unpleasantness that often accompany a controversial viewpoint. Rather, the evi-dence in this case is quite overwhelming that the Confederate symbol had been a cause of very serious, material and substantial disturbance in the school throughout the previous school year. The principal had every right to anticipate that a tense racial situation continued to exist at Brainerd High School as of the beginning of school in September of 1970 and that repetition of the previous year's disorders might reoccur if student use of the Confederate symbol was permitted to resume. Restricting the use of the Con-federate symbol within the school under the circumstances existing within Brain-erd High School at the time of the plain-tiff's suspension accordingly was not vi-olative of the First and Fourteenth Amendments.

An order will enter in accordance with this opinion.

A few further words seem appropriate. Our schools are living through difficult and controversial times. In the midst of our present trials, it would be a griev-ous error for us to forget that this Na-tion and its institutions have survived other difficulties and other controversies. In times past our Nation and its insti-tutions have drawn strength and not weakness from those difficulties. In times past our Nation and its institu-tions have drawn unity and not divisive-ness from those controversies. After one of the most difficult and angry political contests within the history of this Na-tion, President Jefferson had the follow-ing to say in his first inaugural address. They are words which all of us, in our present difficulties, should take to heart, including students of both races at Brainerd High School.

> "During the contest of opinion through which we have passed, the animation of discussion * * * has sometimes worn an aspect which might impose on strangers unused to think freely and to speak and to write what they think, but this being now decided by the voice of the Nation, announced according to the rules of the Constitution, all will, of course, arrange themselves under the will of the law and unite in com-mon efforts for the common good. All, too, will bear in mind this sacred prin-ciple, that though the will of the ma-jority is in all cases to prevail, that will, to be rightful, must be reason-able; that the minority possess their equal rights which equal law must pro-tect, and to violate which would be oppressive. Let us then, fellow citi-zens, unite with one heart and one mind. Let us restore to social inter-course that harmony and affection without which liberty and even life itself are but dreary things."