C. Pim BARNETT et al.

v.

George D'ARTOIS, Commissioner of Public Safety of the City of Shreveport, et al.

Civ. A. No. 16890.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Sept. 20, 1971.

al Defense Committee, C. William Gerhardt, Gerhardt & Walker, Shreveport, La., Stanley A. Halpin, Jr., New Orleans, La., for plaintiffs.

John Gallagher, Roland J. Achee, Ray A. Barlow, Shreveport, La., for defendants.

DAWKINS, Chief Judge.

## OPINION

### PRELIMINARY STATEMENT

Our jurisdiction in this action rests upon 28 U.S.C. § 1343(3). Plaintiffs, under Rule 23 F.R.Civ.P., bring this as a class action[1] under the Civil Rights Act (42 U.S.C. § 1983) to temporarily restrain and preliminarily and permanently enjoin defendants from interfering with the peaceful use of public parks of Shreveport.

Additionally, declaratory relief (28 U.S.C. § 2201) is sought, holding that Ordinance No. 73 of the City of Shreveport is unconstitutional both on its face and as applied in violation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.[2]

After two amendments to the complaint, permitted by Rule 15(a) and (b), F.R.Civ.P., the present posture of plaintiff's complaint further requests that defendant D'Artois be required to return all photographs and identifications of members of plaintiffs' class taken on June 2, 1971, at Columbia Park in Shreveport.

### FINDINGS OF FACT

Alarmed by the ever increasing traffic in heroin, marijuana, and other dangerous drugs (LSD) in Shreveport, the Mayor (Honorable L. Calhoun Allen) and Commissioner of Public Safety (Honorable George D'Artois), together with narcotics officers and Louisiana Police undercover agents, met to discuss means of interdicting this criminal activity.

George M. Strickler, Jr., Elie, Bronstein & Strickler, New Orleans, La., Henry C. Walker IV, Gerhardt & Walker, Shreveport, La., Debra Millenson, New Orleans, La., Lawyers Constitution-

1. As we ruled from the Bench, this is a proper class action. Tr. 2.

2. As Judge Fullam wrote in Hughes v. Rizzo, D.C., 282 F.Supp. 881, 882 (1968), we deal here with "[p]laintiffs [who] exemplify the cultural phenomenon commonly known as the 'hippie' movement."

After several weeks spent with plaintiffs' group, Officers Fussell and Warrington participated in "making" approximately 30 drug cases: a case is made by actually purchasing illegal drugs from a pusher. Their assiduous efforts may have netted more of the people involved in Shreveport's illicit drug traffic, but information revealed that the confidences they painstakingly acquired soon were to be lost. Alerted that their agents' cover was in danger, police officials decided to request warrants and execute them at Columbia Park, a local City Park where the majority of cases of drug transfers had occurred. Thirty-eight warrants were prepared, some being for "John Does" and "Jane Does" because of difficulty in obtaining names without the undercover men creating suspicion.[3]

June 2, police officers converged on Columbia Park (a rather small recreation area)' and sealed off avenues of escape.[4] Sexton testified: "We anticipated there would be forty or fifty in the park and get those people and get a picture and get their names and get out. We anticipated we would get fictitious names of people we wanted. I believe there were two people in the Park that we had warrants for that were arrested later on and we were assisted by pictures." (Tr. 249.) This planned raid, with warrants issued on probable cause, soon turned into a police round-up. The males were pat-frisked, everyone was photographed, and, then, detained in the pavilion for approximately two hours. Some motorists and pedestrians passing Columbia Park on Columbia Street were stopped and the long-hairs among them were directed to the pavilion where they were photographed and identification was requested. Tom Metcalf was typical of the group which was not in the Park originally. On his way to work, at the Sound City recording studio, long-haired Metcalf circled Columbia Park to see if any of his friends were there: "As I turned on to Columbia, there was another car ahead of me and a police officer was staying in the middle of the road and the car ahead of me was passed and he flagged me over to the side and asked me to step out of the car and frisked me and asked me if I would walk over to the pavilion. He led me up to the hill where another patrolman took me to the pavilion and searched me again and asked me to stand in line to took my picture." (Tr. 93.) [5]

3. "Q: How many of the warrants did you state did not have addresses or full names or any names at all?
A: [Fred Sexton, Jr., Assistant District Attorney for Caddo Parish] I am fairly certain there were ten or eleven where we had partial names. Most of these were nicknames without a last name. We had one or two first names with no last names. I think there were four or five where we had a full name and no address."

4. Quantities of LSD tablets and marijuana were found on the Park grounds evidently dropped by members of the group.

5. The trouble which befell Mr. Cleon Worley III was revealed in this exchange:
"Q: Would you tell the Court how you came to be in Columbia Park on June 2?
A: I was on my way home from work and at about 6:24 or 6:25 I took a left-turn off Creswell onto Columbia and about four or five police cars pulled up on the scene and they came out from the cracks in the sidewalk it seemed like and I I asked, 'Why is the park ringed off?' and then we went down to the corner.
Q: Were you escorted into the park?
A: I was shown the way to the pavilion.
Q: What happened when you got to the pavilion?
A: They asked me my name and he wanted to take my picture and took my picture * * *
Q: Did you see other people being stopped on Columbia Street as they drove by the park?
A: I saw people being stopped on Columbia and I had some friends stopped at Creswell and Line.
Q: At the time you were at the pavilion, how many people were there when you left the pavilion?
A: About 162 in my estimation. I would guess around 165." (Tr. 30–32.)

George D'Artois, Commissioner of Public Safety, and one of the undercover agents were present at all times during the detention of the young people in the Park and those brought from the street. The photographs and identifications of those people who were not prosecuted are locked in the files of the Division of Special Investigation of the Shreveport Police Department.

Sunday, June 6, was advertised by pamphlets distributed by the "hippie" community and an underground newspaper as a day on which a rally would be held in Betty Virginia Park to peacefully and silently protest the treatment received by the young people a few days before.[6]

Unaware of any restrictions on use of the City's parks, approximately 100 "hippies" congregated. Despite at first remaining in small groups and causing little concern to anyone, the City officials demanded that the group disperse only a short while after they had gathered at the Park. When so instructed by the Mayor and the Commissioner of Public Safety, the group first sat down, then left once Mrs. Elizabeth Clay promised to obtain a temporary restraining order which would enable them to "return the following Sunday to the Park without fear of being harrassed by the police." (Tr. 41.)

A temporary restraining order could not legally be obtained from this Court in time and the efforts of plaintiffs' attorney to get a permit from the Director of Parks and Recreation, Fred McGaha, were unproductive; he refused "because the request asked for a group meeting where political activities and political discussions would be made and the use of band instruments that would, in my opinion, upset the other people that were in the Park." The authority upon which this decision was made and to which the Mayor and Commissioner later adverted is Shreveport City Ordinance No. 73.[7]

Plaintiffs undaunted by lack of a permit, the unconventionally attired, long-haired group returned to Betty Virginia Park June 13; and, desiring to appear to be as innocuous as possible, at first kept to themselves in small groups and warned away drug abusers by printed "No Holding" placards.[8] After two hours of frisbee-throwing and rapping in peaceful assembly, the police again on the instructions of Allen and D'Artois, noting that they were congregating in sizeable groups, and beginning to set up loud "rock band" instruments, ordered the group, along with a few family picnickers, to disband and vacate the Park. This evacuation was ordered after a short-lived fight drew a small crowd of spectators. Reliable intelligence information had been obtained that "outsiders" and arms were to be brought in. D'Artois' experience had convinced him that the situation was "explosive" and, after conferring with Allen, the order to leave was issued. We find these de-

---

6. There is conflicting testimony on whether this protest was against the drug arrests or against the denial of the right to use the public parks. It is a fact that the protest was to be silent and peaceable: the protesters went to great lengths to insure there was no use of narcotics at Betty Virginia Park on either occasion, June 6 or June 13.

7. Ordinance 73 contains the following sections, *inter alia:*
 "24-60. Any political speech or activity is prohibited on any park or grounds or in any building under the supervision of the Parks and Recreation Council."
 "24-71. It shall be unlawful for any person to use any park area for parties or public meetings of any kind without first securing a permit from Park Officials."

8. A "No Holding" sign in drug talk means do not have or use drugs at this particular gathering.
 We are horrified at the prospect of young children playing in the parks and, following their natural proclivities, swallowing an LSD tablet or consuming any drugs purposefully or inadvertently left on the grounds. Though there is testimony that LSD wrapped in tinfoil was found and tested by police at Columbia Park only, such a cache could occur elsewhere and children tasting it would be less discerning as to its true content.

**1314**

fendants, misled by their intelligence information, misgauged the effect of this flare-up; more importantly, the order also was bottomed on their thought that the rally was an illegal use of the Park. (Tr. 88.)

After Betty Virginia Park was cleared on the 13th, some of those present marched to Columbia Park where they were denied entrance and then proceeded to Gilbert Park which they found closed to them also. Assuming D'Artois' assessment of the events which transpired on June 13 was accurate and the situation indeed was explosive, this does not excuse closing the Park to the "hippies" on June 6. As noted, the June 13 order was based in large measure upon Ordinance 73.

## CONCLUSIONS OF LAW

The delicate interests involved and the pressing nature of the issues have convinced us that a decision should be rendered as soon as possible. There has been no time for either side to submit post-hearing briefs, and, because of this, we have undertaken an extensive in-depth review of the pertinent authorities.

We find plaintiffs' requests for restraining orders and injunctions have been rendered moot by the testimony of D'Artois and Allen:

"Q. To your knowledge, have you ever issued any orders to your police force to get the long-hairs, the hippies, freaks, unconventionally dressed people, etc., to keep them out of the parks?

"A: [D'Artois] No, sir, only on these occasions on my orders, the parks are made for everyone's use when they are used properly. * * *"

(Tr. 69.)

"Q: Mayor Allen, since you have been Mayor have you ever issued a written or verbal order to any of your employees that the parks would be closed to long-hairs, hippies, unconventionally dressed persons, et cetera?

A: No, I have not. * * *

Q: You did not order that the park would be closed only to long-hairs, hippies or unconventionally dressed people?

A: No.

Q: Following June 13, have you issued such an order?

A: No."

(Tr. 210.)

Hippies have been permitted to return to the parks and will not be harassed in their use of them. We in no way hereby curtail the laudable efforts of police agents who, in enforcing constitutional laws, *viz.*, narcotic laws, have arrested alleged drug pushers and abusers on reliable information of undercover agents or informants. These efforts when constitutionally carried out assist society in protecting itself and in protecting naive young people against themselves; but, when unconstitutionally done, is of no help to that worthy goal because prosecution may not be maintained and law enforcement receives a "black eye." We do not question for one moment the worthy motives of Shreveport's officials, and, indeed, urge them to press even harder to combat the drug menace, which has been growing, not only locally, but nation-wide, in recent years, almost by leaps and bounds.

At this point the case diverges into two distinct issues: the facial constitutionality *vel non* of the City ordinance and unconstitutionality of the arrests, searches and seizures, at Columbia Park.

### Unconstitutionality of the Ordinance

■ A single District Judge, not a three-Judge panel, must determine the constitutionality of a City ordinance. Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967). The plain-

tiffs allege that two legislative expressions are opposed to one another:

Amendment I—United States Constitution:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; *or abridging the freedom of speech,* or of the press; *or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.*" (Emphasis added.)

Ordinance No. 73 (1961), amending Shreveport City Charter:

"Any political speech or activity is prohibited on any park or grounds or in any building under the supervision of the Parks and Recreation Council." (Sec. 24–60.)

■ The First Amendment has been made applicable to the States through the Fourteenth Amendment. *E. g.,* Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). There is no allegation that this ordinance has been applied discriminatorily nor could there be in light of the testimony of McGaha,[9] and the action of the police in evicting everyone at the Park on June 6 and 13. The Code section (Sec. 24–60) is not vague.[10] However, the Ordinance is facially invalid for within its umbrage *any* political speech and *any* assembly for political activity is absolutely forbidden.

■ Though the First Amendment is broad and explicit in its scope, it is noted that the right of free speech and peaceable assembly is one of many rights guaranteed by the Constitution and accordingly must be interpreted so as not to infringe upon other rights equally secured by the Constitution.

■ Freedom of speech and assembly are not absolute rights, especially where their exercise infringes upon the rights of others. Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), was a germinal case which attempted to balance public order with personal rights.[11] Justice Goldberg writing for a majority of the Court:

"The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at *any* public place and at *any* time. * * * A restriction in that relation, designed to promote public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil rights which, in other circumstances, would be entitled to protection." (At p. 554, 85 S.Ct. at p. 464.)

The Supreme Court has not hesitated to uphold a statute in face of constitu-

9. "Q: Since you have been employed, which is since February 1 of this year, have you issued a permit for a group who has requested the use of a park for a discussion or constitutional guarantees, political activity or anything of that sort?
A: No, I have not."

10. See Amsterdam, "The Void-for-Vagueness Doctrine in the Supreme Court," 109 U.Pa.L.Rev. 67 (1960), where it is said that overbreadth (or lack of objective standards) is a regulation of A and B when regulation of B is forbidden, and vagueness is an otherwise valid regulation of A, but in terms so uncertain that it is impossible to tell whether a situation comes under A or B, even though B might

otherwise be subject to constitutional regulation. The vice of vagueness is that the statute or ordinance does not give the public or law enforcement officials adequate guidance in distinguishing between lawful and unlawful conduct. Amsterdam is quoted in LeFlore v. Robinson, 434 F.2d 933, 936 (5th Cir. 1970); Hunter v. Allen, 422 F.2d 1158, 1161, n. 5 (5th Cir. 1970).

11. *See* Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1918), wherein Justice Holmes observed that "The most stringent protection of free speech would not protect a man in falsely shouting *fire* in a theatre and causing a panic."

tional attack for overbreadth where it warranted such approval. In Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1967), the Court refused to strike down a statute which the appellants argued was void for overbreadth because, as in *Cox*, the statute did not prohibit picketing "unless engaged in a manner which obstructs or unreasonably interferes with ingress or egress to or from the courthouse." (At p. 617, 88 S.Ct. at p. 1339.) See also, Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); LeFlore v. Robinson, 434 F.2d 933 (5th Cir. 1970); Hunter v. Allen, 422 F.2d 1158 (5th Cir. 1970) reh. den. and reh. en banc den.; Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969) reh. den. October 3, 1969 (Blackmun, J.: "We agree with those courts which have held that a school has inherent authority to maintain order and to discipline students."); Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966).

Impermissible overbreadth in New York's education law caused the Supreme Court to strike down part of that statute in Keyishian v. Board of Regents of University of State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1966).[12] Justice Brennan said:

"They [the Board of Regents] seek to bar employment both for association which legitimately may be proscribed and for association which may not be proscribed consistently with First Amendment rights. Where statutes have an overbroad sweep, just as where they are vague, 'the hazard of loss or substantial impairment of those precious rights may be critical.' [Ci-

tation omitted.] * * * Those covered by the statute are bound to limit their behavior to that which is unquestionably safe." (At p. 609, 87 S.Ct. at 687.)

We quote at length a recent decision of the Supreme Court, Coates, et al. v. City of Cincinnati, 402 U.S. 611, 614–616, 91 S.Ct. 1686, 1688–1689, 29 L.Ed. 2d 214 (1971), holding a city ordinance facially violative of the constitutional right of free assembly and association.[13]

Mr. Justice Stewart observed:

"It is said that the ordinance is broad enough to encompass many types of conduct clearly within the city's constitutional power to prohibit. And so, indeed, it is. The City is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of anti-social conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. [Citation omitted.] It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed.

"But the vice of the ordinance lies not alone in its violation of the due process standard of vagueness. The ordinance also violates the constitutional right of free assembly and association. Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms. [Citations omitted.] The First and Fourteenth Amendments do not permit

---

12. See also, Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Davis v. Francois, 395 F.2d 730 (5th Cir. 1968); Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir. 1968); LeFlore v. Robinson, 434 F. 2d 933 (5th Cir. 1970); Melton v. Young, 328 F.Supp. 88 (E.D.Tenn.S.D.1971); Washington Free Community, Inc. v. Wilson (D.C.D.C.1971); Stacy v. Williams, 306 F.Supp. 963 (N.D.Miss.W.D.

1969); Resistance v. Commissioners of Fairmount Park, 298 F.Supp. 961 (E.D. Pa.1969).

13. The Cincinnati ordinance made it a criminal offense for "three or more persons to assemble * * * on any of the sidewalks * * * and there conduct themselves in a manner annoying to persons passing by * * *."

a state to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people. * * * and such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their life style or their physical appearance is resented by the majority of their fellow citizens.

"The ordinance before us makes a crime out of what under the Constitution cannot be a crime. It is aimed directly at activity protected by the Constitution. * * *" [Footnotes omitted.]

■ Similarly, Section 24–71 of Ordinance 73 of the City's Code is facially unconstitutional since it leaves in the unfettered discretion of the park officials the decision to grant or deny permits. The effect of this section is to empower a single official to refuse access to the city's parks on his mere whim or caprice. No objective standards are established and clearly this violates the Constitution. See, *e. g.*, Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir. 1968); Resistance v. Commissioners of Fairmount Park, City of Philadelphia, 298 F.Supp. 961 (1969).

■ The Ordinance in question announces no standards and absolutely prohibits any constitutional activity in the City's parks. As the Supreme Court has pointed out, even though there may be a legitimate and substantial governmental interest, that interest may not be pursued by means that broadly stifle fundamental personal liberties when the end may be more narrowly achieved. Consequently, we hold that the Ordinance is facially unconstitutional; but this view in no way restricts the City's power to regulate, under adequate and objective standards, the conduct of anyone in the park who might engage in drug abuse or who by unruly action causes other citizens to forego the pleasures of our City's parks or interrupts the peace of those living nearby. We have dealt at some length with this Ordinance: we are deeply aware of the delicate balance which must be struck between the parties' interests, and we entertain no naive notion of the motives which impelled plaintiffs to stage their two Betty Virginia protest rallies, on June 6 and June 13. Notwithstanding, a reasonable exercise of First Amendment rights will be protected by this Court. However, those rights will not be allowed to serve as a screen for the distinctive odor of marijuana or for any other illegitimate activity which properly may be restricted by the authorities.[14]

14. The Second Circuit in Wolin v. Port of New York Authority, *supra*, held that the Port Authority could not abridge by absolute prohibition the right of political expression in a bus terminal. In deciding that the terminal was a permissible forum, Judge Kaufman engaged in this reasoning:

"However, where the issue involves the exercise of First Amendment rights in a place clearly available to the general public, the inquiry must go further: does the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance. The factors to be considered are essentially the same, be the forum selected for expression a street, park, shopping center, bus terminal, or office plaza. * * *

"The Terminal building is an appropriate place for expressing one's views precisely because the primary activity for which it is designed is attended with noisy crowds and vehicles, some unrest and less than perfect order. Like a covered market place area, the congestion justifies rules regulating other forms of activity, but it seems undeniable that the place should be available for use in appropriate ways as a public forum. The admission of charity solicitors, glee clubs and automobile exhibitions without untoward incident evidences the ease with which the Terminal accommodates different forms of communication. To deny access to political communication seems an anom-

*Unconstitutionality of the Arrests, Searches, and Seizures*

The Fourth Amendment expressly declares "the right of the people to be secure in their persons * * * against unreasonable searches and seizures." This constitutional right to be free from unreasonable interference by police officers is incontrovertible and has been made fully applicable to the States, under the Fourteenth Amendment, in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961). It is admitted by defendants that police activity in Columbia Park on June 2 resulted in a mass arrest of 80 to 100 young people, mostly long-hairs and "freaks." [15]

 Only six people among the crowd gathered there were arrested pursuant to warrants which had been obtained for probable cause. Where arrests are made without a warrant, the requirements as to the sufficiency of the information before the officer may act are surely not less stringent than where an arrest warrant is obtained. The fundamental requirement of probable cause turns upon whether the facts and circumstances were sufficient to warrant a prudent man in thinking that the arrestee had committed or was committing an offense. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). As the Supreme Court indicated in Sibron v. State of N. Y., 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), policemen who search citizens must have constitutionally adequate, reasonable grounds for doing so. The self-protective search for weapons must be based on particular facts from which an officer reasonably could infer that the person being searched was armed and dangerous. Clearly the facts surrounding the Columbia Park "raid" could not provide the police probable cause to arrest those for whom they had no warrants; although in light of the reliable intelligence information possessed by them, the facts were such that a self-protective pat-frisk could be constitutionally tolerated. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967).[16] The record is wholly devoid of any jus-

---

alous inversion of our fundamental values." (392 F.2d pp. 89–90.)

Addressing itself to what regulations could be imposed, the Court suggested reasonable limitations on the numbers of persons participating at one time, or the duration of the demonstration, and on the specific places within the building. We might add that the frequency with which a group may gather and the need for a permit or advance notice to the officials might be matters subject to legitimate housekeeping regulations. These regulations would apply to rallies not individuals or small groups. See also Davis v. Francois, *supra*, 395 F.2d pp. 735–736. It is suggested, therefore, that an appropriate ordinance, in lieu of those sections of No. 73 herein found to be infirm, ought to be adopted forthwith by Shreveport's City Council. Such a new Ordinance also constitutionally could include interdiction of unusually loud noises, such as music, amplifiers, motor cycles, open car mufflers and the like, which unduly would disturb other persons using the parks and those living in their near vicinity.

15. "On June 2, 1971, you testified that under your direction, a raid was directed at Columbia Park. Isn't it a fact, Commissioner, that those persons who were in Columbia Park who were detained at the pavilion under your direction, that those persons taken off the street were technically under arrest?

"A: Any time you detain someone, you arrest them." Tr. 70–71.

16. A reading of the following credible testimony proves that intelligence information revealing the presence of Molotov cocktail materiel and weapons reached the police before the June 2 raid and searches:

"Q: Generally speaking, prior to Sunday, [June 6,] did your office, through your policemen and yourself, receive information that guns, and so on, were being brought into town?

A: [D'Artois] Oh, yes, sir. We had a lot of information on this that a lot of them would have guns and a lot of them would have homemade fire bombs and this type thing." Tr. 65. See also, Tr. 79, 78, and 88.

The marijuana seized when the young man volunteered his wallet before a pat-frisk was initiated was validly done as was the arrest.

tification for the warrantless arrests of any of the young people in Columbia Park except the six for whom warrants were held. The situation particularly was aggravated by the fact that one of the undercover agents was present when the raid occurred and was available for positive identification of any whose descriptions were on the John Doe or Jane Doe warrants. The searches and seizures of those arrested pursuant to lawful warrants were valid under the Constitution. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).